554 So.2d 221 (1989)
Wilma Joyce HASTINGS, et vir, Plaintiffs-Appellants,
v.
SOUTHERN NATIONAL INSURANCE COMPANY, et al., Defendant-Appellant.
No. 20957-CA.
Court of Appeal of Louisiana, Second Circuit.
December 6, 1989.
Writ Denied February 16, 1990.
*222 Roland V. McKneely, Jr., Bossier City, for plaintiffs-appellants, Wilma & Loyd Hastings.
David L. White, Bossier City, for defendant-appellant, Mid-American Indem. Co.
Before MARVIN, NORRIS and HIGHTOWER, JJ.
MARVIN, Judge.
In this action for personal injury damages arising out of a rear-end accident, the underinsured motorist carrier of plaintiffs appeals a judgment awarding plaintiffs their UM policy limit of $10,000.
Plaintiffs also appeal, seeking to assess LRS 22:658 penalties and attorney fees against their UM carrier.
The threshold issue is whether the trial court abused its discretion in determining that the general damages sustained by plaintiffs exceed the $10,000 liability policy limits that was paid them by the liability insurer of the rear-ending motorist who was solely at fault. The UM carrier contends that plaintiff Mrs. Hastings' general damage award should not exceed $4,000, which, when special damages of about $5,500 are added, is less than the $10,000 liability proceeds.
The trial court, exercising its prerogative, obviously weighed the credibility of the complaints of plaintiffs more heavily than did the UM insurer.
We amend to assess statutory attorney fees and penalties against the UM insurer and affirm the amended judgment.

FACTS AND CONTENTIONS
Mrs. Hastings was driving her Buick automobile when it was rear-ended on MLK Drive in Shreveport on Saturday, October 24, 1987, by an Oldsmobile when Mrs. Hastings braked and slowed in response to a third vehicle that entered her right-of-way. The rear-end collision broke the headrest on the driver's seat of the Buick.
The next morning Mrs. Hastings, experiencing difficulty getting out of bed, a severe headache, and pain in her neck and shoulder, saw her family physician, Dr. McKay, a general practitioner. He prescribed medication to counteract her pain and instructed her to come to his office on Monday, the next day, October 26.
Mrs. Hastings continued to complain of a headache and pain on Monday. Dr. McKay found severe tenderness of the neck, limitation of motion, and involuntary muscle spasms, as well as tenderness in the dorsal *223 spinal area. He gave her a cortisone injection, a deep heat treatment, and prescribed a muscle relaxant, a cervical collar and pain medication.
Mrs. Hastings saw Dr. McKay five times, essentially with the same complaints and treatment, before he suggested orthopedic consultation and treatment, first by Dr. Simonton, who saw her on November 3, and then by Dr. Bicknell, who had successfully treated Mr. Hastings some months before the accident. Dr. Bicknell saw her about eight times between November 9, 1987, and November 15, 1988. Dr. Bicknell found some straightening of the "normal" cervical lordotic curve of the spine, corroborating the finding of severe sprain. He continued her treatments of moist heat and medication and prescribed periodic physical therapy treatments for Mrs. Hastings. On December 7, Dr. Bicknell released Mrs. Hastings to return to work.
The doctors agreed that Mrs. Hastings sustained a severe musculoligamentous sprain of her cervical and upper thoracic spinal areas.
On January 13, 1988, Mrs. Hastings returned to Dr. Bicknell, again with complaints of neck pain and headaches. Dr. Bicknell said that when he released Mrs. Hastings on December 7, he did not expect any permanent residual effect but explained it was "not too unusual" that she might have some recurrence of symptoms. His January 13 examination revealed tenderness in the same areas of the lower cervical spine and pain with motion. He said the absence of muscle spasm on this date indicated that she was improving and getting better. He attributed her neck pain and headaches to muscular pain. He prescribed a different muscle relaxant and anti-inflammatory medication, suggesting she continue moist heat treatments at home.
Mrs. Hastings returned to Dr. Bicknell on February 16, March 2, March 11, and March 25, with similar complaints, for which he continued her physical therapy treatments and sometimes changed her medication. On March 25 Mrs. Hastings said she was "much improved." Dr. Bicknell's physical examination revealed a full range of motion with no particular tenderness. Believing that Mrs. Hastings would continue to improve, he released her on March 25 for the second time.
On June 24, Mrs. Hastings returned to Dr. Bicknell again complaining that she had been experiencing neck pain for two weeks. His examination revealed tenderness, particularly in the lower cervical area, and pain associated with motion, a finding he said was not unexpected, for the injury she sustained may cause a patient to "have some ... discomfort from time to time afterwards."
Dr. Bicknell explained that although most people who suffer the injury sustained by Mrs. Hastings heal in about three months, Mrs. Hastings' problems continued off and on for several months.
Although Dr. Bicknell did not expect Mrs. Hastings to have "major problem or serious difficulty," he said it was probable that she will continue to suffer some discomfort on occasion and may require medication or further therapy, particularly since these types of injuries make her more susceptible to further problems.
Dr. Bicknell, responding to different questions, said it was "unusual" (on the one hand) and "possible" (on the other) for a patient to be released twice and continue to complain. Dr. Bicknell attributed Mrs. Hastings' complaints on each of her visits to the auto accident notwithstanding that she sometimes went four or five weeks without treatment. He said this pattern occurs in about 10 percent of the cases. Dr. Bicknell further testified that Mrs. Hastings working as a grocery cashier would tend to aggravate her injuries and make it difficult for her to perform her duties. Dr. Bicknell's testimony by deposition was taken on August 30, 1988, before the November trial.
Mrs. Hastings testified she returned to Dr. Bicknell in September and again on November 15, 1988, the month of the trial, complaining of the same symptoms. She testified that the swelling in her neck and shoulder appears from time to time and causes her "aches and hurts" and "a bad *224 headache." She said she has not had a single day without pain since the accident, that she continues to buy medication (muscle relaxants and anti-inflammatory) and that she has not gone for as long as two months without medication. She received physical therapy about 30 times during the year following the accident.
Before the accident Mrs. Hastings had worked as a cashier at a convenience grocery (Lo-Mart) for nine months, until June 1987. She said Lo-Mart was then "short of business" and she agreed to be "voluntarily laid off" so she could spend time with her children. She was called back to work by Lo-Mart three days after the accident but could not then return to work. She testified she "pressured" Dr. Bicknell to release her to return to work in December 1987 because she needed to earn money even though she was then still "hurting." Mrs. Hastings said that Lo-Mart gave its cashier two weeks notice when that cashier was fired. Mrs. Hastings replaced this cashier and returned to work for Lo-Mart on December 17. She worked off and on until June, when she was "terminated" because she frequently suffered from pain and was not able to work.
Her former Lo-Mart supervisor corroborated her testimony in this respect. He said Mrs. Hastings was a good worker, but it was apparent that she was working in pain even though she did not complain. He testified that she was "laid off" because of her absences after she resumed working and her apparent pain and inability to do her work. He corroborated Mrs. Hastings' time off work.
Mrs. Hastings explained that she returned to Dr. Bicknell in January 1988 because she was still hurting. She gave the same explanation for returning to Dr. Bicknell on March 2.
During the trial, Dr. McKay, who was a witness, examined Mrs. Hastings at the suggestion of the court. In his in-court examination he found an area on the posterior of the neck and shoulder that was "quite tender" and "quite noticeable." He testified that he was not surprised that she still was complaining. He said that people with a "severe neck sprain ... commonly called a whiplash injury" can have residual symptoms for years. Dr. McKay again said her injuries were "severe" and that he would expect her symptoms to continue "for some time," but did not say for how long. He said he did not otherwise "feel qualified" to estimate the duration of the symptoms because he sees only 10 to 12 of such injuries each year.
On the evidence which we have summarized, we cannot conclude that the trial court's award of the $10,000 UM policy limits is error or an abuse of discretion. More than one year after the accident, Mrs. Hastings continues to complain of occasional and recurring pain in her neck and back, she still takes medication and has difficulty doing routine housework. Dr. Bicknell and Dr. McKay said her injuries were "severe" and that she would occasionally experience painful symptoms for an indeterminate time. Neither doctor indicated that Mrs. Hastings was a malingerer or that she exaggerated her complaints.
Emphasizing that Mrs. Hastings was twice released to return to work and then returned to Dr. Bicknell within five weeks with the same complaints, Mid-American argues her injuries cannot be as "bad" or severe as the trial court found. On this record, we disagree.
The record supports the trial court's determination that the damages plaintiff sustained exceeds the $10,000 paid by the liability insurer. Mid-American suggests that Mr. Hastings' claim of some amount for loss of consortium is not supported. The trial court simply awarded both plaintiffs the $10,000 UM policy limit.
Mrs. Hastings' special damages totaled over $5,500. She proved she lost about $1,670 in wages in the year following the accident. Considering then that the general damage award and the loss of consortium award, if any, totals about $14,500 ($10,000 liability proceeds and $10,000 UM proceeds, less $5,500), we cannot say the trial court's award of $10,000 UM limits is abusively high.
*225 In Goodwin v. Hartford Acc. & Indem. Co., 530 So.2d 1218 (La.App. 2d Cir.1988), Mrs. Goodwin suffered an injury to her shoulder, neck and back as well as an ulnar nerve injury in her elbow. Mrs. Goodwin's shoulder and neck injuries lasted for about seven months. We noted that her medical expenses totaled only $261.45. Her general damage award for both injuries was only $8,750. We held that the lowest amount that the jury could have awarded for the cervical strain was $5,000.
Here, Mid-American seeks to have us say that the $10,000 paid by the liability insurer is "adequate" and fair for Mrs. Hastings, who should receive not more than $4,000 in general damages over and above special damages of about $5,500.
In Rachal v. Agudosi, 496 So.2d 1274 (La.App. 3d Cir.1986), Mrs. Rachal's vehicle was in a minor rear-end collision. She suffered "mild" soft tissue injuries to her neck. She recovered in seven weeks. Her award of $17,000 was reduced on appeal to $7,000. Mrs. Hamilton, who was a guest passenger in Rachal's vehicle, suffered a "mild" cervical strain. Mrs. Hamilton's award of $20,000 was reduced on appeal to $10,000, primarily because she recovered in two months.
In Johnmeyer v. Creel, 499 So.2d 571 (La.App. 2d Cir.1986), we reduced Mr. Johnmeyer's general damage award from $20,000 to $10,000, the highest amount which we found could have been reasonably awarded. His shoulder and left cervical area muscle strain endured for only two months with no residual effects.
The cases cited by Mid-American do not persuade us otherwise. See and compare Tindall v. Kampen, 492 So.2d 1274 (La. App. 4th Cir.1986), and Davis v. Galilee Baptist Church, 486 So.2d 1021 (La.App. 2d Cir.1986). Mrs. Davis, e.g., suffered a less than severe sprain of the cervical and lumbar spine of about one year duration when her vehicle was struck on its side in an accident. She did not take off from work as her doctor suggested. We commented that the $3,500 general damage award was low, but not abusively low. Here, Mrs. Hastings sustained a severe injury the effects of which continued more than a year and which may continue indefinitely, according to her doctors.
Pretermitting consideration of any award to Mr. Hastings, we find a general damage award of about $14,500 to Mrs. Hastings is not an abuse of the trial court's discretion, even though it is arguably, a comparatively high award.
We affirm the trial court's judgment in this respect.

PENALTIES AND ATTORNEY FEES
After trial concluded, the trial court promptly ruled that the damages due plaintiffs was the $10,000 UM policy limit and that the penalties and attorney fee "close issue" would not be decided until post-trial briefs were submitted by each litigant. After briefs were submitted the trial court held that Mid-American's brief "cited adequate factual background and legal authority" to deny penalties and attorney fees. For these reasons, we must respectfully disagree:
Penalties and attorney's fees shall be assessed under LRS 22:658 when the UM carrier arbitrarily and capriciously fails to tender payment on a claim within 60 days after receiving demand and "satisfactory proof of loss." This "proof" may be found when the insurer has received sufficient facts which fully apprise the insurer: (1) that the operator of the other vehicle involved in the accident was uninsured or underinsured; (2) that the other operator was at fault; (3) that such fault gave rise to damages (4) to the extent of the UM "coverage" applied. See Hart v. Allstate Ins. Co., 437 So.2d 823 (La.1983).
A claimant, of course, has the burden of proving the insurer's failure to pay the claim was arbitrary and capricious and without probable cause.
Mid-American admits the other driver was solely at fault in causing damages to Mrs. Hastings. The real issue is whether the other driver was "underinsured" to the extent that the damages sustained particularly by Mrs. Hastings exceeded the $10,000 *226 liability policy insuring the other driver. We have agreed that her damages did.
A liability insurer is obligated to act in good faith and deal fairly in paying the claims of its insured. Where uninsured motorist coverage is part of a liability policy, the UM carrier's primary duty is to its own insured. Cloney v. Smith, 441 So.2d 342 (La.App. 5th Cir.1983), writ denied. We apply the same principle to this under insured motorist claim.
The attorney for Mr. and Mrs. Hastings made written demand and forwarded a notice of the loss with a copy of the accident report, and copies of all medical expenses and medical reports to the UM carrier. Its adjuster, as well, reviewed Dr. Bicknell's deposition of August 30, 1988. The adjuster received letters from Lo-Mart, although not on Lo-Mart's letterhead, supporting Mrs. Hastings' claim for lost wages. He discounted the letters, he said, because they were not on a letterhead and "anyone could have written them." He did not, however, attempt to verify their authenticity with Lo-Mart or with plaintiff's counsel, who regularly corresponded with him by telephone and by letter. Mrs. Hastings' time off work was corroborated at trial. Moreover, the adjuster persisted in evaluating her injuries as a "mild cervical sprain," but admitted all medical reports characterized Mrs. Hastings' injuries at least as "moderately severe."
The adjuster explained that his "investigation" was to obtain a copy of the accident report (one was also sent to him by counsel for plaintiffs); to request a "sworn" statement from Mrs. Hastings (which request, he said, was denied by her attorney). The adjuster said he tried twice, without success, to determine the liability policy limits from the liability insurer's adjuster, whose name was given him by plaintiffs' attorney. He admitted that he did not attempt to obtain this information from the State insurance authority or from Mid-American's attorney. The claims adjuster further testified that he was not aware until August 1988 that the liability policy had been filed in the record when plaintiffs' counsel informed him of this fact.
The record supports the conclusion that the adjuster's investigation was perfunctory. He simply corresponded with plaintiffs' counsel, reviewed the medical reports and Dr. Bicknell's August 30, 1988, deposition, attempted on two occasions to contact the liability insurance adjuster and persisted in his unsupported conclusion that only "mild cervical injuries" were sustained. He based his characterization of Mrs. Hastings' injuries as "mild" in part on Dr. Bicknell's implication that no spasms were found after his first examination of Mrs. Hastings. The adjuster did not attempt to contact Dr. Bicknell to clarify his several reports nor did the adjuster change his opinion of Mrs. Hastings' claim after reviewing Dr. Bicknell's deposition which is to the contrary, as we have summarized.
In short, the adjuster failed to reasonably investigate the complaints of Mid-American's insured, Mrs. Hastings, and persisted in his initial conclusion that she sustained only a "mild" injury of short duration.
Because of these circumstances, we find that Mid-American's adjuster did not reasonably investigate the damage claim of his insured. In this respect, he was not in good faith and did not deal fairly with his insured. We further find that his failure to make a reasonable investigation was without probable cause and his denial of any UM claim was arbitrary and capricious.
Accordingly, while assessing the penalty, we shall avoid a remand and determine the amount of attorney's fees to be assessed against the UM carrier under LRS 22:658. Reichert v. Continental Ins. Co., 290 So.2d 730 (La.App. 1st Cir.1974), writ denied.
Trial of the case took one day. A post-trial brief was written. Two pre-trial depositions were taken. Interrogatories were posed and answered and additional discovery (request for admissions, motion for production of documents) was undertaken. Compare Bird v. Daniels, 508 So.2d 611 (La.App. 2d Cir.1987), writ denied.
Considering the record compiled below and here, the quality of the work, and the result, we deem that $4,500 is a reasonable attorney fee. We amend to assess that fee *227 against the UM carrier in addition to the statutory penalty of ten percent on the amount awarded by the trial court judgment. LRS 22:658.

DECREE
The judgment is amended to assess $4,500 attorney fees and ten percent of the $10,000 award ($1,000) as statutory penalties against Mid-American Indemnity Company.
As amended and at the cost of Mid-American Indemnity Company, the judgment is affirmed.
AMENDED AND AFFIRMED.
HIGHTOWER, J., dissents and assigns written reasons.
HIGHTOWER, Judge, dissenting.
I respectfully dissent.
In my opinion, the award represents an abuse of discretion. Dr. Bicknell found Mrs. Hastings to have muscle spasm on only the first visit. She progressed well and was released to return to work within six weeks. Thereafter, she continued to work with the exception of a three week interruption. Despite returning to her doctor with complaints, she received conservative treatment and tended to improve with time. She was never hospitalized. Dr. Bicknell testified that this type of injury normally requires about three months for recovery. Her problems persisted longer, but she was twice released from treatment. After the second release, which occurred five months after the accident, she returned some three months later for one visit with the doctor.
I further and most emphatically dissent from the award of penalties and attorney's fees.